SDD:AAS/DMP/ICR
F.#2014R00564

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ 'DEC - 6 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

YING LIN,
    also known as "Randi Lin" and
"Randy Lin,"

             Defendant.

- - - - - - - - - - - - X

SUPERSEDING
INDICTMENT

Cr. No. 15-601 (S-2) (DLI)
(T. 18, U.S.C., §§ 951(a), 981(a)(1)(C),
1349, 1512(c)(2), 1512(k), 2 and 3551 et
seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c); T. 31, U.S.C., §§ 5317(c),
5324(a)(3) and 5324(d)(1))

THE GRAND JURY CHARGES:

At all times relevant to this Superseding Indictment, unless otherwise indicated:

## INTRODUCTION

I.    The Defendant

        1.    The defendant YING LIN, also known as "Randi Lin" and "Randy Lin," was a native of the People's Republic of China ("PRC") and a naturalized U.S. citizen who resided in Queens, New York.

        2.    LIN was employed by an international air carrier (the "Carrier") headquartered in the PRC. From 2002 through the fall of 2015, LIN worked as a counter agent for the Carrier at John F. Kennedy International Airport ("JFK Airport") in Queens, New York. From the fall of 2015 through April 2016, LIN worked as the station chief for the Carrier at Newark Liberty International Airport in Newark, New Jersey.

3. Beginning in 2002 and continuing to the present, the Carrier operated flights between JFK Airport and the PRC, among other locations.

## II. The PRC Establishments

4. The Permanent Mission of the PRC to the United Nations (the "PRC Mission") was a diplomatic establishment in New York, New York serving as the PRC delegation to the United Nations. The PRC also maintained a Consulate in New York, New York, which was a diplomatic establishment that provided consular services to PRC and foreign citizens in the New York area (the "PRC Consulate"). The PRC Mission was responsible for representing the PRC on the United Nations Security Council and in plenary meetings of the United Nations General Assembly. PRC personnel stationed at the PRC Mission included officials from various arms of the PRC government, including the People's Liberation Army and Ministry of Defense. In order to obtain diplomatic status in the United States, PRC personnel stationed at the PRC Mission were required to register with the U.S. Department of State prior to or upon their entry into the United States.

## III. The Defendant's Illicit Activities Under the Direction and Control of the PRC

### A. The Defendant's Acts As an Agent of a Foreign Government

5. Since approximately 2002, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," agreed to operate within the United States subject to the direction and control of a foreign government and a foreign official by using her position as a counter agent with the Carrier to smuggle items onto Carrier flights departing from JFK Airport to the PRC and to carry out other tasks at the direction and under the control of PRC agents working at the PRC Mission and the PRC Consulate. In return, LIN received benefits

from the PRC Mission and the PRC Consulate beyond her compensation as an employee of the Carrier.

6. On multiple occasions between January 2010 and April 2016, individuals from the PRC Mission and the PRC Consulate delivered packages to be shipped from New York to the PRC. The defendant YING LIN, also known as "Randi Lin" and "Randy Lin," and other employees of the Carrier, accepted such packages for transport. Such packages were marked as "no ticketed passenger" in the Carrier's computer system and appeared as "no ticketed passenger" bags on the Carrier's flight manifest and records, similar to the way baggage was handled for members of the Carrier's flight crew who were piloting and stewarding the aircraft. The packages were transported on Carrier flights as though they were checked bags. On several occasions, LIN came to JFK Airport outside of her regular employment hours for the Carrier in order to handle requests from agents of the PRC Mission and PRC Consulate.

7. LIN instructed other Carrier employees, in sum and substance and in part, that the Carrier was a PRC Company and, accordingly, the employees' primary loyalty should be to the PRC.

8. In or about 2012, an employee (the "Employee") of the Carrier received a request from PRC agents working at the PRC Mission who had registered with the U.S. State Department as employees of the PRC "Department of Defense" (the "PRC Military Officers") to place unaccompanied packages on board a Carrier flight to the PRC. The Employee refused. The Employee later informed the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," that such activity violated rules and regulations promulgated by the

Transportation Security Administration ("TSA"), which was an agency of the United States Department of Homeland Security responsible for the security of the traveling public in the United States. LIN responded, in sum and substance and in part, that the practice of transporting packages from JFK Airport to the PRC as unaccompanied luggage on behalf of PRC agents was longstanding, and encouraged the Employee to continue to accept unaccompanied baggage from individuals from the PRC Mission and PRC Consulate for shipping via Carrier flights from JFK Airport to the PRC.

        9. Subsequently, the Carrier's general manager distributed to the Carrier's employees at JFK Airport a letter purportedly authorizing employees of the Carrier to accept unaccompanied baggage from individuals from the PRC Mission for shipping on Carrier flights from JFK Airport to the PRC. Copies of this letter were maintained at the Carrier's offices at JFK Airport and in a lockbox at the Carrier's ticket counter at JFK Airport so that Carrier employees would understand the Carrier's purported policy as to such unaccompanied baggage.

        10. In addition to accepting unaccompanied baggage from PRC Military Officers, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," also checked in the unaccompanied baggage under the names of actual passengers on Carrier flights to the PRC. For instance, on or about June 26, 2014, LIN accepted for shipping on a Carrier flight from JFK Airport to the PRC two large shrink-wrapped cardboard boxes from two PRC Military Officers. The PRC Military Officers were not passengers of the Carrier traveling to the PRC. LIN checked in the PRC Military Officers' baggage under the name of a passenger on an outbound Carrier flight.

11. In another incident on or about July 24, 2014, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," assisted one of the PRC Military Officers who was about to depart on an outbound Carrier flight (the "officer") by taking the SIM card from his phone. At the time, the officer had already passed through the TSA security checkpoint, and was located in an area where only screened passengers and employees could enter. LIN took the officer's SIM card and brought it to a second PRC military officer who was waiting on the other side of the TSA checkpoint. In doing so, LIN helped ensure that the SIM card would not be subject to further screening, such as a jetway border search, by U.S. border officials prior to the flight's departure.

12. In exchange for acting under the direction and control of the PRC Military Officers and other PRC government officials, LIN received benefits from the PRC Mission and the PRC Consulate. These benefits included tax-exempt purchases of discounted liquor and electronic devices, worth tens of thousands of dollars, as well as free contracting work by PRC construction workers at LIN's personal residences in Queens, New York.

B. <u>Regulations for Agents of Foreign Governments</u>

13. An individual who acted in the United States as an agent of a foreign government, such as the government of the PRC, was required to provide prior notification to the Attorney General, under the rules and regulations established by the Attorney General. <u>See</u> 18 U.S.C. § 951(b); 28 C.F.R. Sections 73.1 <u>et seq</u>.

14. The term "agent of a foreign government" included an individual who agreed to operate within the United States subject to the direction or control of a foreign government or official. <u>See</u> 18 U.S.C. § 951(d).

C. The Defendant Is Not Exempt from the Notification Requirement

15. At no time was the defendant YING LIN, also known as "Randi Lin" and "Randy Lin":

(a) a duly accredited diplomatic or consular official of a foreign government, recognized by the United States Department of State;

(b) an officially and publicly acknowledged and sponsored official or representative of a foreign government; or

(c) an officially and publicly acknowledged and sponsored member of the staff of, or employee of, any such officer, official, or a representative of a foreign government.

16. The offense conduct charged herein engaged in by the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," did not constitute a legal commercial transaction.

17. As a foreign air carrier operating in the United States, the Carrier was subject to TSA rules and regulations. Pursuant to its regulatory authority, the TSA promulgated rules and regulations regarding, inter alia, the processing and screening of cargo and luggage transported on passenger flights within and from the United States.

18. Pursuant to Title 49, United States Code, Section 44906, which is titled "Foreign air carrier security programs," each foreign air carrier was required to "adopt and use a security program" approved by the TSA. See 49 U.S.C. § 44906. As applicable to the Carrier's flights between JFK Airport and the PRC, TSA implementing regulations provided that the Carrier's security program be designed to ensure that checked baggage is accepted by

a responsible agent of the Carrier and to prevent checked baggage from being loaded aboard Carrier airplanes unless handled in accordance with the Carrier's security procedures. See 49 C.F.R. §§ 1546.101(a), 1546.103(b)(3) & (b)(4).

19. On or about February 17, 2002, the Carrier submitted to the TSA a model security program that provided that "checked baggage is accepted only from ticketed passengers." As of September 30, 2013, the Carrier's security program required that it "ensure that checked baggage is accepted only from ticketed passengers, only by an authorized representative of the carrier, and, in the United States, only at the airport counters."

20. The TSA regulations were also directly applicable to the defendant YING LIN, also known as "Randi Lin" and "Randy Lin." TSA regulations imposed a personal obligation on LIN not to tamper, interfere with, or attempt to circumvent the security measures adopted in the Carrier's security program. Specifically, TSA regulations stated that "No person may . . . [t]amper or interfere with, compromise, modify, attempt to circumvent, or cause a person to tamper or interfere with, compromise, modify, or attempt to circumvent any security system, measure, or procedure implemented under this subchapter." See 49 C.F.R. § 1540.105(a)(1).

21. By accepting unaccompanied baggage from PRC government officials for shipping on Carrier flights from JFK Airport to the PRC, the Carrier and its employees, including the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," intentionally failed to carry out the Carrier's security program, which required that it accept checked baggage only from ticketed passengers, thereby violating TSA regulations.

8

22. In addition, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," engaged in conduct that exceeded the illegal activities purportedly authorized by the Carrier. LIN's acts of checking baggage from PRC Military Officers under the names of actual passengers on Carrier flights to the PRC when the PRC Military Officers were not passengers of the Carrier traveling to the PRC violated federal and state law. It was a crime to deprive another of the intangible right of honest services, in violation of Title 18, United States Code, Sections 1343 and 1346, and to engage in commercial bribery, in violation of New York Penal Law Section 180.05. Under the latter statute, "[a]n employee, agent or fiduciary is guilty of commercial bribe receiving in the second degree when, without the consent of [her] employer or principal, [she] solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence [her] conduct in relation to [her] employer's or principal's affairs." LIN's conduct violated these federal and state laws.

IV.  **The Defendant's Compensation for Her Activities Under the Direction and Control of the PRC, and the Wire Fraud Conspiracy**

23. The benefits that the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," received in exchange for acting under the direction and control of the PRC Military Officers and other PRC government officials included (a) free contracting work at LIN's personal residences in Queens, New York, and (b) tax-exempt purchases of discounted liquor and electronic devices.

A.  Receipt of Free Contracting Work

24. The defendant YING LIN, also known as "Randi Lin" and "Randy Lin," received free contracting work at her residences in Queens, New York, by employees of a construction business (the "Construction Business") based in the PRC that performed construction work on PRC governmental facilities in the United States, including the PRC Mission, the Embassy of the PRC to the United States, and PRC consulates in the United States. Workers employed in the United States by the Construction Business included PRC nationals brought by the Construction Business into the United States for this specific purpose.

25. The Construction Business workers who were PRC nationals entered the United States pursuant to A2 and G2 visas issued by the U.S. Department of State, pursuant to an agreement between the United States and the PRC to permit such PRC nationals to enter the United States to perform construction work on PRC diplomatic facilities. Under this agreement, PRC construction workers admitted to the United States under A2 and G2 visas for the purpose of performing construction work on PRC diplomatic facilities were "restricted to project-related work and shall leave the [United States] upon conclusion of the project," except that "a limited number of [PRC] personnel . . . shall be permitted to remain in the [United States] . . . for the sole purpose of correcting any construction defects and establishing maintenance and operation procedures." A2 and G2 diplomatic visas issued to the Construction Business workers did not permit independent contracting work at non-PRC facilities, such as the Queens, New York residences of the defendant YING LIN, also known as "Randi Lin" and "Randy Lin."

### B. Tax-Exempt Purchases of Discounted Liquor and Electronic Devices

#### i. Bonded Warehouse Program

26. The U.S. Department of State, Office of Foreign Missions ("OFM"), offered the Bonded Warehouse Program to foreign missions and their personnel so they could purchase tax-free and duty-free merchandise from approved bonded warehouse facilities in the United States. One such bonded warehouse facility in New York State was the Diplomatic Shop, operated by the Diplomatic Duty Free Shops of New York. OFM approved these purchase requests only if the associated merchandise was intended either for the official benefit of foreign missions or for the personal use of their eligible members. Such articles included alcoholic beverages, cigarettes and foodstuffs.

27. Foreign missions and personnel wishing to obtain tax-free and duty-free purchases from a bonded warehouse facility were required to submit requests associated with the purchase of tax-free and duty-free merchandise from bonded warehouse facilities via the U.S. Department of State E-Government system, which was operated in Washington, D.C. A purchase request indicated, among other things, the name of the mission, the user and the intended use of the merchandise. After approving a purchase request, OFM provided via the E-Government system an approval form, which a diplomatic customer needed to present to the bonded warehouse facility at the time of purchase.

#### ii. Tax-Exempt Purchases

28. New York State imposed a sales tax on the sale of all tangible goods. All merchandise such as liquor and electronics were subject to sales tax and sales tax reporting. Businesses that sold goods that were subject to sales tax were required to register with the New

11

York State Department of Taxation and Finance ("NYS Tax Department") as sales tax vendors. Such businesses were required to impose a sales tax on the purchases of their customers and remit such sales taxes to the NYS Tax Department on either a monthly or quarterly basis, depending on the size of the business. Such businesses were required to accurately report the total amount of gross and taxable sales to the NYS Tax Department with their monthly or quarterly payments of sales tax.

29. Consistent with state and federal law, Apple, Inc. ("Apple"), which was a manufacturer of electronic devices that operated retail outlets in New York State, permitted diplomatic customers who presented tax-exempt identification to make tax-free purchases at Apple retail outlets. This purchase program was only available to diplomatic personnel. Each tax-free purchase caused the creation of an internal electronic form listing the details of the tax-free purchase, including the tax-exempt identification number used by the purchaser, which Apple maintained for inspection by the NYS Tax Department. During the period from 2010 to 2015, Apple filed New York State and Local Quarterly Sales and Use Tax Returns with the NYS Tax Department together with its quarterly payments of sales tax. These quarterly filings purported to set forth Apple's true and accurate gross sales of taxable goods for each quarter in which they were filed.

iii. The Illegal Wire Fraud Scheme

30. In return for acts of the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," on behalf of agents of the PRC, the PRC Military Officers and other personnel from the PRC Mission and the PRC Consulate made numerous tax-free purchases on LIN's behalf and for LIN's benefit of (a) liquor from the Diplomatic Store through the

Bonded Warehouse Program and (b) electronic devices from Apple retail outlets. In making these purchases, the PRC Military Officers and other PRC Mission personnel falsely informed OFM and Apple that these purchases were made for the official use of the PRC Mission or PRC Consulate or the personal use of their personnel. As a result of these improper purchases of electronics and liquor, LIN did not pay otherwise applicable New York State sales tax on these items. LIN illegally arranged to purchase tax-free the following items on or about the following dates, knowing that acquisitions made for her personal use were not eligible for tax-free treatment:

| Date | Description of Item Purchased |
| --- | --- |
| 1/4/12 | One 13-inch 256 GB Apple MacBook Air with Core i7 processor |
| 2/9/12 | One unspecified Apple computer with $1,799 retail value and one white 32 GB iPad2 with wifi |
| 5/13/12 | One 64 GB iPad3 with wifi |
| 7/16/12 | One white 4G 32 GB iPad3 with wifi |
| 12/12/12 | Four bottles of Hennessey Richard, six bottles of Hennessey Paradis Extra and six bottles of Hennessey XO Grand Champagne |
| 12/31/12 | One white 16 GB iPad2 |
| 1/28/13 | Three black Apple 5 computers and two black 16 GB iPad mini devices |
| 1/13/14 | Ten bottles of Hennessey Richard, six bottles of Hennessey Paradis Extra and twenty-four bottles of Hennessey XO Grand Champagne |
| 10/25/14 | Two 16 GB iPad mini2 devices with wifi, one 128 GB iPhone6 and one 64 GB iPhone6+ |
| 11/6/14 | Three gold 16 GB iPhone 6+ |
| 3/21/15 | One gold 64 GB iPhone and one gold 1524 edition 64 GB iPhone |
| 5/11/15 | Two iWatches with stainless steel bands |

31. The defendant YING LIN, also known as "Randi Lin" and "Randy Lin," arranged these purchases of tax-free liquor and electronic devices via communications on

LIN's personal email account (the "Lin Email Account") with the PRC Military Officers and other representatives from the PRC Mission or the PRC Consulate. Some of the emails sent or received by LIN on the Lin Email Account were routed via electronic wire communications through a server in Mountain View, California. By arranging to fraudulently purchase these goods through programs for which she was ineligible, LIN executed a scheme to deprive New York State taxation authorities of sales tax revenue. On multiple occasions, these goods were delivered to one of LIN's personal residences in Queens, New York or to LIN at JFK Airport.

V. The Defendant's Obstruction of Justice

32. During the summer and fall of 2015, the federal government was investigating the activities of a confederate (the "Confederate") of the defendant YING LIN, also known as "Randi Lin" and "Randy Lin." The Confederate was a PRC national who visited the United States beginning in approximately August 2015. The Confederate was the owner of a large residence in Old Brookville, Long Island; LIN was responsible for renovating and furnishing the property, among other property management responsibilities. As part of its investigation of the Confederate's activities, Special Agents of the Federal Bureau of Investigation interviewed LIN's two adult daughters on October 20, 2015. During these interviews, agents asked LIN's daughters questions about the Confederate.

33. Following these interviews, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," warned the Confederate about the federal government's interest in the Confederate's activities and instructed him to flee immediately. At the request of the Confederate and while working with others, LIN arranged for the Confederate's immediate departure from the United States aboard a Carrier flight to the PRC.

34. On or about October 28, 2015, the Confederate departed for Beijing, China aboard a Carrier flight from JFK Airport.

## VI. Currency Transaction Reports

35. Domestic financial institutions were required to file a Currency Transaction Report ("CTR") with the Internal Revenue Service for each "deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000," pursuant to Title 31, United States Code, Section 5313(a) and Title 31, Code of Federal Regulations, Section 1010.311.

36. "Structuring" a financial transaction meant the breaking down of a sum of currency exceeding $10,000 into smaller amounts of $10,000 or less prior to transacting business with a domestic financial institution in an attempt to evade currency reporting requirements, as defined in Title 31, Code of Federal Regulations, Section 1010.100(xx).

## COUNT ONE
(Acting as an Agent of a Foreign Government
Without Prior Notification to the Attorney General)

37. The allegations in paragraphs one through 31 are realleged and incorporated as if fully set forth in this paragraph.

38. In or about and between January 2010 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," did knowingly act in the United States as an agent of a foreign government, to wit: the PRC, without prior notification to the Attorney General of the United States, as required by law.

(Title 18, United States Code, Sections 951(a) and 3551 et seq.)

## COUNT TWO
(Conspiracy to Commit Wire Fraud)

39. The allegations in paragraphs one through 31 are realleged and incorporated as if fully set forth in this paragraph.

40. In or about and between January 2010 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the NYS Tax Department, and to obtain money and property, to wit: sales tax revenue, from it by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNT THREE
(Obstruction of Justice)

41. The allegations in paragraphs 32 through 34 are realleged and incorporated as if fully set forth in this paragraph.

42. In or about and between October 2015 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct,

influence and impede, an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York.

(Title 18, United States Code, Sections 1512(c)(2), 2 and 3551 et seq.)

## COUNT FOUR
(Conspiracy to Obstruct Justice)

43. The allegations in paragraphs 32 through 34 are realleged and incorporated as if fully set forth in this paragraph.

44. In or about and between October 2015 and April 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," together with others, did knowingly, intentionally and corruptly conspire to obstruct, influence and impede an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York, contrary to Title 18, United States Code, Section 1512(c)(2).

(Title 18, United States Code, Sections 1512(k) and 3551 et seq.)

## COUNT FIVE
(Structuring Financial Transactions)

45. The allegations in paragraphs 35 and 36 are realleged and incorporated as if fully set forth in this paragraph.

46. On or about and between August 24, 2010 and August 24, 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YING LIN, also known as "Randi Lin" and "Randy Lin," together with others, for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and the regulations prescribed thereunder, did knowingly and intentionally structure

and assist in structuring one or more transactions with one or more domestic financial institutions, to wit: Citibank, N.A., HSBC Bank USA, N.A., JPMorgan Chase Bank, N.A., and TD Bank, N.A., by making and causing to be made cash transactions in individual amounts of less than $10,000, but in aggregate amounts in excess of $10,000.

(Title 31, United States Code, Sections 5324(a)(3) and 5324(d)(1); Title 18, United States Code, Sections 2 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS TWO THROUGH FOUR

47. The United States hereby gives notice to the defendant that, upon her conviction of any of the offenses charged in Counts Two through Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of any such offenses to forfeit any property, real or personal, constituting or derived from proceeds traceable to a violation of such offenses, including but not limited to approximately $199,800.00 in United States currency, seized on or about April 6, 2016 from JPMorgan Chase Safety Deposit Box Number 5366, located at 187-08 Horace Harding Expressway, in Fresh Meadows, New York.

48. If any of the above described forfeitable property, as a result of any act or omission of the defendant;

      (a) cannot be located upon the exercise of due diligence;

      (b) has been transferred or sold to, or deposited with, a third party;

      (c) has been placed beyond the jurisdiction of the court;

18

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); Title 21, United States Code, Section 853(p))

### CRIMINAL FORFEITURE ALLEGATION AS TO COUNT FIVE

49.    The United States hereby gives notice to the defendant that, upon her conviction of the offense charged in Count Five, the government will seek forfeiture in accordance with Title 31, United States Code, Section 5317(c), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense and any property traceable thereto, including but not limited to: (a) approximately 16,100 Yuan Renminbi, and approximately $23,500 in United States currency, both seized on or about April 5, 2016 from a residence located at 57-07 Parsons Boulevard, Fresh Meadows, New York; (b) approximately $45,200 in United States currency, seized on or about April 8, 2016 from JPMorgan Chase Safety Deposit Box Number 10239, located at 410 Northern Boulevard, in Great Neck, New York; and (c) approximately $18,950 in United States currency, approximately 8,770 Hong Kong Dollars, and approximately 1,205 Yuan Renminbi, all seized on or about April 22, 2016 from TD Bank Safety Deposit Box Number 365, located at 38-19 Main Street, in Flushing, New York.

50.     If any of the above described forfeitable property, as a result of any act or omission of the defendant;

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the court;

        (d)    has been substantially diminished in value; or

        (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 31, United States Code, Section 5317(c); Title 21, United States Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. #2014R00564
FORM DBD-34
JUN. 85

No. 15-CR-601 (S-2) (DLI)

## UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

*YING LIN,*

Defendant.

## SUPERSEDING INDICTMENT

(T. 18, U.S.C., §§ 951(a), 981(a)(1)(C), 1349, 1512(c)(2), 1512(k), 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c); T. 31, U.S.C., §§ 5317(c), 5324(a)(3) and 5324(d)(1)

*A true bill.*

_____
Foreperson

*Filed in open court this* _____ *day,*
*of* _____ A.D. 20 _____

_____
Clerk

*Bail, $* _____

*Alexander A. Solomon, Assistant U.S. Attorney (718) 254-6074*
*Douglas M. Pravda, Assistant U.S. Attorney (718) 254-6268*