

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP/AAS/ICR
F. #2014R00564

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

November 15, 2019

<u>By ECF and Hand Delivery</u>

Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Ying Lin
                  <u>Criminal Docket No. 15-601 (AMD)</u>

Dear Judge Donnelly:

        The government respectfully submits this letter regarding sentencing of the defendant Ying Lin, also known as "Randy Lin" and "Randi Lin," scheduled for November 21, 2019.  On April 17, 2019, the defendant pleaded guilty to acting in the United States as an agent of a foreign government, the People's Republic of China ("PRC"), without prior notification to the Attorney General of the United States, as required by law, in violation of 18 U.S.C. § 951.  For the reasons set forth below, the government respectfully submits that the Court should impose a sentence of 48 months' custody, which is sufficient, but not greater than necessary, to serve the purposes of sentencing outlined in 18 U.S.C. § 3553(a) and in line with sentences in other prosecutions charging substantive violations of 18 U.S.C. § 951.

I.     <u>Background</u>

        A.     <u>The Defendant's Activities as a PRC Agent</u>

        Beginning in or around 2002 until the fall of 2015, the defendant worked as a counter agent and VIP customer service manager for a PRC-based international air carrier (the "Carrier") at John F. Kennedy International Airport ("JFK Airport") in Queens, New York. From the fall of 2015 through April 2016, the defendant worked as the station manager for the Carrier at Newark Liberty International Airport in Newark, New Jersey.

        While employed by the Carrier, the defendant operated within the United States subject to the direction and control of the PRC government by using her position with the Carrier to smuggle items onto Carrier flights departing from JFK Airport to the PRC and to carry out other tasks at the direction of PRC government officials working at the Permanent

Mission of the PRC to the United Nations ("PRC Mission") and the Consulate General of the PRC in New York City ("PRC Consulate"). In return, the defendant received benefits from the PRC Mission and the PRC Consulate beyond her compensation as an employee of the Carrier.

The following are several non-exhaustive examples of the defendant's conduct at the direction and control of PRC government officials, including PRC military officers who had registered with the U.S. Department of State as employees of the PRC "Department of Defense":

- Accepting packages from PRC government officials and checking them in for transport on Carrier flights from JFK Airport to the PRC as "no ticketed passenger" bags (S-2 Ind. ¶ 6);

- Accepting packages from PRC government officials and checking them in for transport on Carrier flights from JFK Airport to the PRC under the names of actual passengers who were not the PRC government officials bringing the packages (id. ¶ 10);

- Coming to JFK Airport outside of her regular employment hours for the Carrier in order to handle requests from agents of the PRC Mission and PRC Consulate (id. ¶ 6); and

- Assisting a PRC government official by taking the SIM card from the official's phone after he had passed through a TSA security checkpoint and bringing it to a second PRC government official who was waiting on the other side of the TSA checkpoint (id. ¶ 11).

The defendant was not a passive agent of the PRC government, but rather took advantage of her position of employment to ensure that the actions of other Carrier employees were similarly in the best interests of the PRC government. A source advised the government that shortly after a new station manager began running the Carrier's operations at JFK Airport in 2012, the station manager was approached by three individuals who worked for the PRC Mission who requested to place packages as unaccompanied baggage on board a Carrier fight bound for the PRC. The station manager refused to accept the packages for shipping, believing it to be a violation of TSA and FAA regulations. Following the station manager's refusal, the defendant advised the station manager that the practice of the Carrier shipping unaccompanied baggage on behalf of PRC government officials was longstanding, and that the station manager should continue the practice. The station manager told the defendant that the practice violated applicable TSA rules and regulations, and was dangerous because no one opened the packages to verify their contents. Ultimately, the PRC Mission's Military Staff Committee went directly to the Carrier's General Manager in New York to formalize the practice in a written document on the letterhead of the Military Staff Committee, so that all of the Carrier's employees would assist in transporting unaccompanied baggage to the PRC. For her part, the defendant instructed other Carrier employees that the Carrier was a PRC company and, accordingly, the

employees' primary loyalty should be to the PRC Government. The defendant's conduct began long before that policy was formalized in 2012 and continued until her arrest in 2015.

In exchange for acting under the direction and control of PRC military officers and other PRC government officials, Lin received benefits from the PRC Mission and the PRC Consulate, which included tax-exempt purchases of discounted liquor and electronic devices, worth tens of thousands of dollars, as well as free contracting work by PRC construction workers at the defendant's personal residence and a rental property in Queens, New York. In particular, in or about October 2015, Lin arranged for a significant renovation of the ground floor rental apartment in the Fresh Meadows house in which she lived after one of her tenants moved out. This October 2015 renovation followed a multi-day May 2015 renovation of the kitchen and bathroom of a different cooperative apartment owned by the defendant after her tenant moved out. In both cases, all of the construction and renovation work was performed by PRC construction workers admitted to the United States on diplomatic visas solely to perform construction work on PRC government diplomatic facilities.

At no point did the defendant ever notify the Attorney General that she was acting as an agent of the PRC government in the United States.

    B.    <u>The Defendant's Structuring Activities</u>

During its investigation the government obtained financial records indicating that, in part to avoid triggering reporting requirements that could expose the source of her compensation for acting as an agent of the PRC government, between approximately August 2010 and August 2015, the defendant structured cash transactions with multiple financial institutions in aggregate amounts in excess of $10,000. The defendant's former co-workers similarly advised the government that the defendant gave them cash in exchange for checks so that she would not have to deposit cash, and that she sold them expensive merchandise, such as iPhones, that she had purchased with the assistance of PRC government officials who had abused their diplomatic tax-exemptions to help the defendant obtain the items tax-free.

At the time of her arrest, the defendant was in possession of approximately $50,000 in cash contained in a distinctive wrapping that she attributed in a post-arrest statement to one of the confidantes of the individual identified below as "the Confederate." Subsequent judicially authorized searches of the defendant's residence and safe deposit boxes revealed hundreds of thousands of dollars of additional cash. One of the defendant's safe deposit boxes contained approximately $200,000 in cash, some of which was similarly wrapped to the cash found on her person at the time of her arrest. Other evidence obtained in the searches indicated that the defendant held foreign bank accounts.

Indeed, the defendant was able to afford a lifestyle inconsistent with her relatively modest salary from her employment at the Carrier, and modest earnings from her two travel-related businesses. She leased luxury cars, owned multiple residences and had access to large amounts of cash, none of which could reasonably be explained as the proceeds of her work for the Carrier or her two businesses.

C. The Defendant's Arrest and Subsequent Efforts to Obstruct Justice

On or about August 25, 2015, the defendant was arrested on a complaint charging her with wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343 and 1344, and structuring financial transactions to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(3) and 5324(d)(2).

In her post-arrest statement, Lin admitted that on at least one occasion she accepted boxes from two individuals whom she knew to work for the PRC Mission, that she placed those boxes aboard a Carrier flight to the PRC even though the two individuals were not traveling on that flight, and that she knew that placing unaccompanied baggage on an aircraft is a violation of airport policy and regulations.

After her arrest, between October 2015 and April 2016, Lin also obstructed justice and conspired to obstruct justice by, among other things, instructing another individual (the "Confederate") to flee the United States and making arrangements for the Confederate to flee. During the summer and fall of 2015, the federal government was investigating the activities of the Confederate and, in particular, whether the Confederate was himself acting in the United States as a PRC agent without notifying the Attorney General. As part of the government's investigation of the Confederate's activities, the government served a federal grand jury subpoena on one of Lin's daughters with respect to a pending grand jury investigation in the Eastern District of New York involving the Confederate. As Lin was aware that her daughter had received a grand jury subpoena, she was therefore aware of a then-pending grand jury investigation in the Eastern District of New York. Thereafter, special agents of the Federal Bureau of Investigation interviewed Lin's two adult daughters on October 20, 2015, during which agents asked Lin's daughters questions about the Confederate.

Following these interviews, Lin warned the Confederate about the federal government's interest in the Confederate's activities and instructed him to flee immediately. At the request of the Confederate and while working with others, Lin arranged for the Confederate's immediate departure from the United States. On or about October 28, 2015, the Confederate departed for Beijing, PRC aboard a Carrier flight from JFK Airport.

To conceal her efforts to obstruct the investigation from law enforcement, Lin sent numerous electronic messages to the Confederate through a third-person (the "Intermediary"). Indeed, in a series of text messages sent to the Confederate through the Intermediary on or about October 25, 2015, the defendant gave the Confederate detailed advice about how to evade government surveillance:

> No need to call back; this is what I want to tell you. Don't know if SMS messages are safer than phone calls.
>
> As previously thought, you are the target. Divination symbols indicate, "Get it done immediately if there is a goal; return immediately if there is none." They don't have evidence against you, so they can't stop you from returning to China, unless the

4

> prosecutor requests that you help with the investigation and detains --
>
> -- you at the airport. So, be prepared and be careful with everything, including booking tickets, carrying baggage, checking out of the room, and calling for car service. To avoid any trouble, can I transfer the receipts in the email into images before sending them to your cell phone?
>
> Also, immediately delete every phone call, every SMS message received and sent, to avoid any surprises.
>
> When roaming with a Chinese number over there, it uses networks there; it's possible to get the phone number and duration of the conversation. SMS messages are not intercepted in real-time; it should be that only the number and time that is intercepted, not the content of the communication. Thus, read and delete immediately.

On or about October 26, 2015, the Confederate responded to Lin through the Intermediary:

> You said something about they are focusing on [the Confederate], how do you know? . . . [The Confederate] wants you to book the return ticket for him--
>
> -- is it okay?

Subsequently, on or about October 26, 2015, the Intermediary sent the Confederate a message from the defendant in which she reported on information she had gleaned from the government's questioning of her daughters:

> The two kids were called in to be questioned, "It is said that many people are really afraid of [the Confederate], why? He has a nickname of [omitted], is that right? The kids--
>
> -- said he was mom's friend, and had dinner together; he was not scary, and would pat us on our heads." The lawyer said that the prosecutor had revealed that they had been focusing on [the Confederate], and told me not to contact him no matter what, or the case couldn't be wrapped up. . . . [The Confederate]--
>
> -- has a ticket; only needs to change the date. I will go look for the ticket number in the next couple of days. (I didn't think they would let [the Confederate] leave the country. If he can leave, do so as soon as possible.)

5

The same day the Confederate sent a response to the defendant through the Intermediary in which he asked the defendant to "book seats on a morning flight" returning to Beijing, China in the next three days: "Wednesday, Thursday, or Friday." The defendant responded to the Confederate through the Intermediary later that day and asked if the Confederate could leave the United States on October 28, 2015. The defendant also asked the Confederate to send her a text message with the ticket number and plotted to use her position as a customer service manager for the Carrier as a cover story to explain away her communications with the Confederate if she was questioned by law enforcement:

> Is it okay for [the Confederate] to leave on October 28th? Can he text and ask me to book a ticket on October 28th? Don't say anything about the house on the phone. Because --
>
> -- once he leaves without a problem, the U.S. government will interview me again, asking what contact method was used. I can say that [the Confederate] had sent me text messages, and I was still with [the Carrier] so I was obligated to provide booking service to Platinum Customers. Leave them with no--
>
> -- loopholes to make any charges.

Lin subsequently made arrangements for the Confederate's travel to the PRC on a Carrier flight. The Confederate departed on or about October 28, 2015, and has not returned to the United States since.

### D. The Defendant's Indictment and Guilty Plea

The defendant was initially indicted on structuring charges on November 23, 2015. On December 6, 2017, a grand jury sitting in the Eastern District of New York returned a second superseding indictment charging the defendant with acting as an agent of a foreign government without prior notification to the Attorney General in violation of 18 U.S.C. § 951 (Count One), conspiring to commit wire fraud in violation of 18 U.S.C. § 1349 (Count Two), obstruction of justice and conspiring to obstruct justice in violation of 18 U.S.C. §§ 1512(c)(2) and 1512(k) (Counts Three and Four), and structuring financial transactions in violation of 31 U.S.C. § 5324 (Count Five).

Pursuant to a plea agreement with the government, on April 17, 2019, the defendant pleaded guilty to acting as an agent of the Government of the People's Republic of China without prior notification to the Attorney General, in violation of 18 U.S.C. § 951.

## II. Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a

6

sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In doing so, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, "in determining the particular sentence to be imposed," the Court "shall consider," among others, the following factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; . . .
>
> (3) the kinds of sentences available; . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

"The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, if any, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III. The Sentencing Guidelines

A. There Is No Sufficiently Analogous Guideline

The appropriate offense level under the United States Sentencing Guidelines is typically determined by reference to the statutory index contained in Appendix A to the Sentencing Guidelines. U.S.S.G. § 1B1.2(a). For statutory violations that are not listed in the index, the Guidelines instruct that the "most analogous offense guideline" is to be used. U.S.S.G. § 2X5.1 Where, however, there is no sufficiently analogous guideline, then the Court is to sentence the defendant anywhere within the statutory sentencing range based on the application of the Section 3553(a) factors. See U.S.S.G. § 2X5.1 ("If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control . . . .").

Here, the defendant has been convicted of violation 18 U.S.C. § 951, a statute that is not included in the statutory index to the Sentencing Guidelines. Moreover, as the government informed the Court during the defendant's plea hearing, the government does not believe that there is a sufficiently analogous Guideline for the offense of conviction, 18 U.S.C. § 951. See Def. Plea Agr. ¶ 2 ("Because 18 U.S.C. § 951 is a felony for which no Guideline expressly has been promulgated, and because there is no sufficiently analogous Guideline, the Office believes that the provisions of 18 U.S.C. § 3553 control the imposition of an appropriate sentence in this case, pursuant to U.S.S.G. § 2X5.1."). The government respectfully submits that this Court should conclude as well that there is no analogous guideline for the offense of conviction, as numerous courts have found with respect to Section 951 violations. See United States v. Butina, No. 18-CR-218, ECF No. 120 at 11-12 (D.D.C.) (noting that "[t]he majority of the courts that have dealt with this issue have determined that § 951 does not have a sufficiently analogous guideline" and similarly finding no sufficient analogous guideline where defendant was convicted of conspiracy to violate Section 951); United States v. Soueid, No. 11-CR-494, ECF No. 59 (E.D. Va.) (Defendant convicted of a violation of § 951 for conducting surveillance on Syrian dissidents in the United States on behalf of Syrian government; Court found no sufficiently analogous Guideline); United States v. Chun, No. 16-CR-618, ECF No. 17 at 10 (S.D.N.Y.) (Defendant, a FBI technician, convicted of violating § 951 for providing sensitive, but not classified, information to Chinese officials) (Parties jointly submitted that there was no analogous Guideline, and Court agreed); United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.) (Defendant responded to taskings by Cuban intelligence services over thirty-year period and sent reports back to Cuba in response to those taskings; Court found no sufficiently analogous Guideline range); United States v. Buryakov, No. 15-CR-73 (S.D.N.Y.), ECF No. 158 at 6-7, 17 (Defendant convicted for violating § 951, following a plea pursuant to Fed. R. Crim. P. 11(c)(1)(C), for agreeing to provide information to a Russian official; Court found no analogous Guideline range); United States v. Duran, No. 07-CR-20999 (S.D. Fla.), ECF No. 488 at 42-43 (Defendant convicted of §§ 371 and 951 for attempting to bribe/extort a U.S. citizen on behalf of the government of Venezuela; Court found no analogous Guideline).

8

Indeed, just one of the compelling facts that show that there is no sufficiently analogous guideline is that the Probation Department and defendant have proposed multiple different guidelines to apply to the defendant's conduct:

First, in the initial PSR, the Probation Department proposed applying U.S.S.G. § 2C1.1, a guideline that covers "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions." (See PSR ¶ 22). Specifically, the Probation Department noted that the defendant's conduct was most similar to bribery by an individual other than a public official. The defendant objected to the application of that guideline, contending that it was inapplicable because that guideline applies to the bribery of public officials and that the defendant's conduct did not involve bribery of public officials (seemingly ignoring in that analysis that the applicable test is whether the guideline is an analogous guideline, not a guideline that specifically covers the defendant's conduct).

Second, in her objection to the PSR, the defendant argued instead that the most analogous guideline was U.S.S.G. § 2B1.1, which covers "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." Specifically, the defendant argued that this guideline was the most analogous guideline because the allegations of the indictment included an allegation that the PRC officials had enabled the defendant to purchase duty free liquor and electronics as a quid pro quo for her foreign agent activity. (Def. PSR Objections, dated Sept. 9, 2019, at 7).

Third, in response to the PSR objections from the government and the defendant, the Probation Department, in an addendum to the PSR, then changed course and determined that the most analogous guideline was U.S.S.G. § 2B4.1, a guideline that applies to "Bribery in Procurement of Bank Loan and Other Commercial Bribery." (See PSR Addendum, dated Oct. 17, 2019, at 2-3). Specifically, the Probation Department stated that upon review of the facts and circumstances of the offense, the guideline for commercial bribery was more applicable than the guideline for bribery of a public official. (See id. at 2).

The government submits that the fact that the Probation Department and the defendant propose three separate guidelines as "the most analogous guideline" only highlights the fact that no guideline provision is sufficiently analogous to cover the defendant's criminal activity.

B. The Guidelines Proposed by the Defendant and the Probation Department Are Not Sufficiently Analogous to Cover the Defendant's Offense Conduct

In any event, none of these proposed guidelines are sufficiently analogous to be applied to the defendant's criminal activity. At bottom, none of those guidelines adequately accounts for the serious threat to U.S. national security caused by a foreign agent's undisclosed

9

activities in the United States on behalf of a foreign government, in violation of 18 U.S.C. § 951. The defendant argues that the government has never provided a factual basis for accusing her of posing a security threat, arguing that she never engaged in espionage or subversive activities and did not threaten the safety of or security of airline passengers because the packages all passed through TSA screening. (Def. Mem. at 15.) The defendant misunderstands the nature of the national security threat posed by her conduct. The government has not suggested that the packages contained classified or sensitive materials or that they contained explosives or other materials which TSA screening is designed to detect. Rather, as set forth in more detail below, over 13 years of service to the PRC government, the defendant established a clandestine means of transmitting to the PRC materials obtained and valued by PRC military officers while concealing their source, nature and destination from the United States government.

The defendant's proposed "analogous" guideline, Section 2B1.1, is designed to quantify the harm caused or intended by theft of property through fraud and other means. While the defendant certainly deprived New York State tax authorities of sales tax revenue through her receipt of tax-free goods and services as part of her compensation for acting as an agent of the PRC Government, it is absurd to argue that her theft of sales tax revenue is the primary conduct for which she should be punished, or that her offense conduct, and her ultimate sentence, is appropriately compared to that of other thieves and fraudsters.

The defendant justifies her proposed application of Section 2B1.1 on two grounds: (a) that it applies to false statements to a government official, which she claims is similar to her failure to notify the government of her foreign agent status, and (b) that it applies to general fraud offenses, such as the wire fraud with which she was charged in the Indictment based on her deprivation of state taxation authorities of sales tax revenue as a result of her receiving tax-free goods as part of her compensation for her foreign agent activities. Both grounds are flawed.

First, in analogizing her crime to making a false statement to a government official, the defendant fails to recognize that her failure to notify the Attorney General of her activities on behalf of the PRC is but one element of her criminal conduct under Section 951. The defendant's offense is far from a simple failure to notify. Section 951 criminalizes the *action* of the agent of a foreign government without notification to the Attorney General, not merely the *failure to notify* the Attorney General. Here, among the actions the defendant took on behalf of the PRC was to assist PRC government officials in sending packages back to the PRC in a manner that subverted the ability of U.S. law enforcement and counterintelligence officials from tracking the conduct of PRC government officials on U.S. soil. That action is nowhere accounted for in the Section 2B1.1 guideline. Indeed, but for her actions on behalf of the PRC, no notification to the Attorney General would have been necessary. And the failure to notify the Attorney General was not merely a false statement to a government official, but a concerted effort by the defendant to conceal her activities on behalf of the PRC.

The defendant also argues that Section 2B1.1 is analogous because it carries a base offense level of seven, which is similar to the base offense level for other guidelines that

address the failure to provide information or to make required disclosures to the government, such as failing to file a tax return, failing to register for military service, failing to maintain pension records, and failing to report campaign contributions. (Def. Mem. at 17). In making this analogy, however, the defendant ignores that Congress has determined that a violation of Section 951 is far more serious than any of these other offenses—including a false statement offense under Section 1001—by imposing a 10-year statutory maximum sentence for a violation of Section 951 compared to much lesser sentences for these other crimes. See 18 U.S.C. § 1001 (five-year maximum penalty for false statements); 18 U.S.C. § 1027 (five-year maximum penalty for failure to maintain or disclose pension records); 26 U.S.C. §§ 7201 and 7203 (one-year and five-year maximum penalties for willful failure to file a tax return); 29 U.S.C. § 439 (one-year maximum penalty for false statements or failure to disclose material facts in reports of labor organizations); 50 U.S.C. App. § 462 (five-year maximum penalty for failure to register for military service); 52 U.S.C. § 30109(d) (one-year, two-year and five-year maximum penalties for failing to disclose campaign contributions). Moreover, unlike Section 951, none of these other offenses that the defendant claims are analogous require any additional act in addition to the false statement or failure to act. Section 951, in contrast, requires acts taken within the United States at the direction or control of a foreign government or official. See, e.g., Butina, No. 18-CR-218, ECF No. 120 at 12 ("The offenses that the defense argues are analogous do not require any additional act in addition to the deceptive statement or withholding of information. In contrast, § 951 has an action element."). Therefore, the fact that Section 2B1.1 is the applicable guideline for false statements does not make it a sufficiently analogous guideline.[1]

Second, in analogizing her crime to a general fraud offense and arguing that the guideline is appropriately determined by reference to the value of the quid pro quo she received

---

[1] The defendant cites to United States v. Dumeisi, No. 06-CIV-4165, 2006 WL 2990436, at *8 (N.D. Ill. Oct. 2006) in support of her argument that Section 2B1.1 is the most analogous guideline. While the government concedes that that opinion shows that the Court in fact applied the fraud guideline based on the suggestion of defense counsel, the opinion offers no legal basis why the Court determined that the fraud guideline was the most analogous guideline. Moreover, the Court ultimately sentenced the defendant to a total term of 46 months' incarceration – far more than called for by application of the fraud guidelines – although the Court did not break out its sentences by count of conviction. See United States v. Dumeisi, No. 03-CR-664, Doc. 125 (N.D. Ill.). Without more information about the Court's reasoning for applying Section 2B1.1, this Court should not find the Dumeisi decision persuasive enough to overcome the determinations by many other district judges that there is no sufficiently analogous guideline. Notably, a district court recently rejected a defendant's request to follow Dumeisi and apply the Section 2B1.1 guideline to an 18 U.S.C. § 951 offense, stating that "the Court finds that there is no reasoning provided in the Dumeisi decision that would cause this court to disregard the other cases that I've cited and that the government cited" for the proposition that there is no analogous guideline. United States v. Butina, No. 18-CR-218, ECF No. 120, at 12 (D.D.C. Apr. 26, 2019).

11

for her foreign agent activity, the defendant fails to recognize that her theft of sales tax revenue from the State of New York does not remotely compare to the harm she caused or the value she received for her crime. While the government has argued that the defendant was compensated in various ways for her foreign agent activity, including receiving benefits from the PRC Mission and the PRC Consulate such as tax-exempt purchases of discounted liquor and electronic devices as well as free contracting work by PRC construction workers, that compensation was not the primary motivation for the defendant's conduct nor was the compensation an accurate reflection of the value of the services that she provided for the PRC Government. To the contrary, the defendant was motivated first and foremost by her loyalty to the PRC. She not only took these actions on behalf of the PRC, but she instructed and encouraged other employees to do the same, telling them that because the Carrier was a PRC company, their primary loyalty should be to the PRC. The compensation she received represented essentially a "tip" from the PRC government officials for the defendant's assistance, not an equal payment for her services. Indeed, another Carrier employee who—at the defendant's insistence—agreed to help the PRC government officials ship unaccompanied baggage from JFK Airport to China told the government that s/he and other Carrier employees who acted similarly on behalf of the PRC government officials were compensated through tips. For instance, the employee stated that s/he was compensated three to four times a year by members of the PRC Mission in the form of American Express pre-paid cards ranging in amounts from $200 to $500 as well as saving him/her money on the purchase of Apple electronic products, such as an iPhone, through use of their tax-exempt cards. Because these were tips rather than equal compensation for the defendant's services, application of the fraud guideline based on the economic value of the fraud loss is not sufficiently analogous to be used as the applicable guideline.

Similarly, the Probation Department's chosen Guidelines, §§ 2B4.1 and 2C1.1, guidelines applicable to commercial bribery or bribery of a public official, are not intended to incorporate any measure of the harm caused or threatened to U.S. national security by those who covertly aid a foreign government on U.S. soil. Thus, while the defendant did abuse her privileged access to areas of JFK Airport to perform tasks beyond the scope of her employment and received compensation separate from the salary she received from her employer, i.e., commercial bribes, §§ 2B4.1 and 2C1.1 do not adequately address the most harmful aspects of that conduct: that she performed these actions to aid the military officers of the PRC Government without disclosing her activities to the U.S. government.

Because there is no analogous guideline, the Court may sentence the defendant anywhere within the applicable statutory range of zero to 120 months' imprisonment, based on application of the Section 3553(a) factors. The government addresses those factors below.

C. If the Court Applies a Guideline, It Should Include an Obstruction Enhancement

Should the Court disagree with the government's analysis and determine to apply one of the guidelines proposed by the defendant or the Probation Department or a different guideline entirely, the government submits that the Court should apply an enhancement for obstruction of justice. The PSR recommends the inclusion of such an

12

enhancement because "the obstructive conduct of notifying the confederate of a grand jury proceeding and assisting him to leave the Eastern District of New York during the pendency of a criminal investigation warrants the addition of 2 levels per USSG § 3C1.1." PSR ¶ 19. The defendant objected to the enhancement on the grounds that the obstructive conduct was not related to the defendant's criminal activity. The Probation Department disagreed, and stood by the enhancement. Addendum at 2.

In her sentencing submission, the defendant continues to object, arguing that she did not impede the investigation, prosecution or sentencing of the "instant offense of conviction," as she argues is required by Guideline Section 3C1.1. (Def. Mem. at 19). The defendant is wrong on both the facts and the law. Section 3C1.1 provides as follows:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

Here, Judge Irizarry has already determined that the "Defendant's alleged obstruction arose out of her knowledge of the government's investigation of her foreign agent activities." United States v. Lin, 2018 WL 5113139, at *3 (E.D.N.Y. Oct. 19, 2018). Moreover, the defendant's foreign agent activities were not limited to official services provided in her capacity as a Carrier employee. Rather, the defendant's foreign agent activities extended to aiding the Confederate, who was himself under investigation for acting as an agent of the PRC. As the government previously explained in its opposition to the defendant's motion to sever the foreign agent charge from the obstruction charge, the Confederate was well aware of the defendant's actions as a foreign agent, and in pursuing her obstructive conduct, the defendant was motivated in part by her desire that the Confederate not be available as a witness to testify against her (as well as to obstruct the government's own investigation into the Confederate). See ECF 136 at 7 (Sept. 21, 2018). As the defendant described the situation in messages exchanged with the Confederate through an intermediary, once the Confederate left the country, it would leave the government with no "loopholes" to convict the defendant. Accordingly, the obstructive conduct related to the defendant's conviction or a closely related offense, and the obstruction of justice enhancement therefore applies. See U.S.S.G. § 3C1.1.

IV.     The Section 3553(a) Factors

For the reasons detailed below, the government respectfully submits that a sentence of 48 months' imprisonment is sufficient, but not greater than necessary, to reflect the seriousness of the defendant's conduct, the need to promote respect for the law, and the need to provide adequate deterrence to the defendant and to others contemplating similar acts. See 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(B). Moreover, a 48-month sentence is consistent with other sentences imposed for similar conduct, and such a sentence would avoid

unwarranted sentencing disparities among similarly situated defendants. See id. § 3553(a)(3), (a)(6).

> A. The Nature and Circumstances of the Offense

Over 13 years of service to the PRC government, the defendant provided a clandestine means of transmitting to the PRC materials obtained in the United States and valued by PRC military officers, while concealing their source, nature and destination from the United States government. The defendant's actions aided the PRC government's operations on United States soil, so much so that when another employee of the Carrier tried to put a stop to the Carrier's longstanding arrangement with the PRC Mission's Military Staff Committee, the Military Staff Committee went directly to the General Manager of the Carrier to formalize the practice in a written document so that all employees would comply with it. The defendant, however, never required coaxing from her employer to act as an agent of the PRC government. When her colleague tried to stop the practice of shipping unaccompanied baggage aboard Carrier flights, the defendant made clear to him/her that the practice was longstanding and should continue, and in her conversations with other coworkers, she instructed them that their loyalties as employees of the PRC-based Carrier should be with the PRC government.

Among the many goals of a counterintelligence program is identifying the gaps in a foreign government's understanding of our own government and its military and security services. One way to accomplish that goal is to identify materials and information collected by a foreign government's officials abroad and sent back to their headquarters in their home country. Such information, it can be inferred, is valuable to the foreign government because it fills a gap in their understanding of our own. For similar reasons, however, foreign governments seek to conceal the nature of the information they collect on the United States. They do this both to disguise their collection priorities and the sources and methods they use to collect priority information.

The defendant minimizes her offense by claiming that "there has never been another federal criminal case involving the transportation of unaccompanied baggage," but this is not the crime for which she has been prosecuted or for which she must be held to account at sentencing. (Def. Mem. at 28). What the defendant did was to help a foreign adversary to conceal from U.S. government scrutiny the information and materials its military officers and other government officials collected in the United States and returned to the PRC. Because the defendant shipped these materials as unaccompanied baggage under the names of passengers, including a college student visiting family, and not under the names of the PRC military officers who shipped the baggage, and without providing information regarding its contents, source or destination, she made it less likely that U.S. government officials would choose to inspect the baggage and review its contents. In sum, the defendant provided a clandestine courier service to the military officers and government officials of a foreign government adversary, that was intended to harm the U.S. government's ability to protect the nation from the activities of hostile foreign intelligence services.

14

B.   Just Punishment and Deterrence

Given the seriousness of the defendant's offense conduct, a substantial term of imprisonment is necessary to promote just punishment for the offense and to deter the defendant and others from similar conduct.

In her sentencing submission, the defendant minimizes her role in the offense by repeatedly noting that other Carrier employees also engaged in the shipping of unaccompanied baggage and that the practice was sanctioned by the Carrier itself. (Def. Mem. at 8-9, 28). The defendant's actions as an agent of the PRC government, however, long pre-dated the Carrier's official written policy. In a Mirandized post-arrest statement, the defendant admitted that PRC government officials from the PRC Mission had been using the Carrier to ship unaccompanied baggage since the Carrier began flying between JFK Airport and the PRC, which public records show to have begun on September 27, 2002, two days after the defendant began working for the Carrier. Various Carrier employees have advised the government that the defendant is, by far, the single Carrier employee who most often assisted PRC military officers in shipping unaccompanied baggage, and instigated and encouraged others at the Carrier to follow the practice. Indeed, other Carrier employees advised the government that the defendant told them they needed to follow that practice for the benefit of the PRC because the Carrier was a PRC company and their loyalty should be to the PRC. Carrier employees told the government that the PRC military officers brought packages from the PRC Mission to JFK Airport approximately once a month to once every other month, and that there were generally one to three boxes per shipment. Thus, the defendant's actions on behalf of the PRC government were not isolated or aberrant, but represent a consistent pattern of behavior over an extended period of time.

Given that the defendant was the primary Carrier employee who assisted the PRC military officers, that the defendant engaged in that conduct from 2002 through 2015, and that the defendant encouraged other employees and the station manager to engage in the conduct, the defendant is incorrect in asserting that the only distinction between the defendant and her colleagues at the Carrier was that the defendant on one occasion checked unaccompanied baggage under the name of a ticketed passenger. (Def. Mem. at 9).

Beyond the offense conduct however, the defendant's efforts to obstruct the government's investigation of the Confederate—after the defendant had been arrested and placed on court-supervised pretrial release—similarly demonstrates the need for a substantial term of imprisonment to punish the defendant for her recalcitrance and to deter her from further criminal conduct. The communications with the Confederate detailed above make clear that the defendant acted with the express purpose of harming a federal criminal investigation of the Confederate. She warned him that he was the subject of the government's inquiries; she warned him to flee the country before he could be arrested,; and she also warned him—in considerable detail—to take precautions to conceal his communications from law enforcement. When the Confederate solicited help from the defendant to change his ticket, the defendant concocted a cover story that relied on her employment as a customer service agent

15

for the Carrier to explain why she had been in contact with the subject of a federal criminal investigation.

If the defendant's 13 years providing a clandestine courier service for PRC military officers and other government officials were not reason enough to impose a substantial term of imprisonment, the defendant's recalcitrant behavior on pretrial release demonstrates that a substantial term of imprisonment is necessary because a less severe penalty will not deter this defendant from further criminal conduct.

C. The Kinds of Sentences Available and The Need to Avoid Unwarranted Sentencing Disparities

In recommending a sentence of 48 months' imprisonment, the government has compared the defendant's conduct, including her obstructive conduct following her initial arrest in this case, to other sentences imposed in cases charging violations of Section 951. In the only previous Section 951 case in this district, Judge Johnson sentenced the defendant to 120 months' custody – the statutory maximum sentence – for obtaining from manufacturers located in the United States and exporting to Russia advanced, technologically cutting-edge microelectronics used in a wide range of military systems, including radar and surveillance systems, missile guidance systems, and detonation triggers. United States v. Fishenko, No. 12-CR-626, Judgment, ECF No. 488 (E.D.N.Y. Sept. 7, 2016) (sentencing defendant to 120 months' imprisonment on 18 counts of conviction, including violations of Section 951, the Arms Export Control Act, and the International Emergency Economic Powers Act and obstruction of justice, and 60 months' imprisonment on a Section 371 conspiracy count). The sentences imposed for other Section 951 cases in other districts show that the government's requested 48-month sentence is within the range of sentences imposed for Section 951 violations:

- In United States v. Alvarez, No. 05-CR-20943 (S.D. Fla.), the defendant entered a guilty plea to one count of conspiracy to act as an agent of Cuba in violation of §§ 371 and 951. Over a period of approximately 30 years, the defendant gathered information on prominent people, community attitudes, political developments and current events of interest to the Cuban government, and passed that information to Cuba. The Court imposed the statutory maximum of 60 months' imprisonment for the Section 371 conspiracy charge.

- In United States v. Duran, No. 07-CR-20999 (S.D. Fla.), the defendant was convicted at trial for violating 18 U.S.C. § 951 and conspiracy to violate that statute. The government's case established that the defendant came to the United States as an agent of the Venezuelan government in an attempt to bribe and/or extort a U.S. citizen. See United States v. Duran, 596 F.3d 1283, 1295-96 (11th Cir. 2010). The court imposed a sentence of 48 months' imprisonment on each count, to run concurrently.

16

- In <u>United States v. Latchin</u>, No. 04-CR-661 (N.D. Ill.), the defendant was convicted after trial for violating § 951 by acting as a sleeper agent on behalf of Iraq, even though there was no evidence that he ever took any covert action inside the United States. He was also convicted of unlawfully procuring citizenship, making false statements to the FBI and engaging in financial transactions with Iraq, and was sentenced to 48 months' imprisonment on each count.

- In <u>United States v. Dumeisi</u>, No. 03-CR-664 (N.D. Ill.), the defendant was found guilty at trial for violating § 951, conspiring to violate that statute, and two counts of perjury. The defendant received direction from intelligence officers of the Iraqi Mission to the United Nations, collected information on individuals and groups in the U.S. who were considered hostile to the government of Iraq under Saddam Hussein, published articles in an Arab language publication to goad opposition groups to respond for purposes of identifying them, and produced press ID cards for members of the Iraqi Intelligence Service to facilitate their travel within the United States. Following his conviction after trial, the Court sentenced the defendant to a total of 46 months' imprisonment.

- In <u>United States v. Buryakov</u>, No. 15-CR-73 (S.D.N.Y.), the defendant pleaded guilty to violating § 951, stemming from an agreement to take actions within the United States at the direction of a Russian government official. The parties agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), to a sentence of 30 months of incarceration. The court accepted that agreement and imposed a sentence of 30 months' imprisonment.

The defendant argues that the Court should not sentence her based on other Section 951 offenses involving espionage or covert activity or where the defendants sought to harm the United States. (Def. Mem. at 11-13, 26-27). The government agrees that it would not be appropriate to analogize the defendant's case to certain Section 951 offenses involving the sharing of classified or national defense information with foreign governments, which often carry much more substantial sentences. <u>See</u>, e.g., <u>United States v. Chi Mak</u>, No. 05-CR-293 (C.D. Ca.) (defendant who shared classified information concerning Navy warships and submarines with the PRC sentenced to 293 months' imprisonment); <u>United States v. Campa</u>, No. 98-CR-721 (S.D. Fla.) (defendant who shared national defense information about U.S. military installations with the Cuban government sentenced to 228 months' imprisonment). Accordingly, the government has not included those cases in this recitation of comparable cases.

But, for the reasons set forth above, the defendant's actions are behalf of the PRC are comparable to the run-of-the-mill Section 951 cases, even those that involve some clandestine activity or espionage, because the defendant's actions were intended to prevent the

17

U.S. government from being able to identify a route through which PRC military officers were sharing information with the PRC government, thus creating a risk to national security.

Indeed, it is well-settled that the "acts" for which a defendant can be held liable under Section 951 need not be "criminal or inherently wrongful." United States v. Duran, 596 F.3d 1283, 1293 (11th Cir. 2010). Nor do they need involve espionage or other clandestine intelligence gathering activity. In Duran, the Eleventh Circuit explained:

> [T]here is no suggestion in the language of [Section 951], the legislative history, or cases that convictions under § 951 require the conduct to be of that nature [referring to subversive activity or espionage]. To the contrary, the activities that fall within § 951's purview have never been expressly or by judicial interpretation limited to those bearing upon national security or even those which by their nature are criminal or inherently wrongful.

Duran, 596 F.3d at 1293; see also United States v. Lin, 2018 WL 3416524, at *4 (E.D.N.Y. July 11, 2018) ("§ 951 reaches beyond spying and subversive activities 'to *any* affirmative conduct undertaken as an agent of a foreign government.'" (quoting Duran, 596 F.3d at 1295)).

In some the cases cited above, the conduct did not include clandestine activity on behalf of a foreign government. Thus, in Duran, the defendant was convicted for acting as an agent of the Venezuelan government in an attempt to bribe and/or extort a U.S. citizen. There, Argentina officials discovered that a dual U.S.-Venezuelan citizen tried to bring $800,000 in United States currency into Argentina to contribute to an Argentinian presidential candidate on behalf of the Venezuelan government. Duran tried to bribe the U.S. citizen into concealing evidence of that campaign contribution. There was no intelligence gathering or clandestine activity in that case. Duran was convicted of violating Section 951 and conspiring to violate Section 951. The district court sentenced him to 48 months' imprisonment. See Duran, 596 F.3d at 1287-88, 1290.

Similarly, in Latchin, the Seventh Circuit affirmed a Section 951 conviction where the defendant had argued that there was no evidence that he had ever acted in the United States as an agent of a foreign government. Latchin, who had previously been a member of the Iraqi Intelligence Service in Iraq, was asked to relocate to the United States but was unaware that he had been chosen to be a "sleeper" agent for Iraq in the United States. Latchin subsequently took a job as a counter agent at O'Hare International Airport in Chicago, similar to what the defendant did for the Carrier. The Seventh Circuit concluded that while it was unclear whether Latchin "ever took any covert action once he arrived in the United States," there was still sufficient evidence of his guilt under Section 951 because he received compensation from Iraqi Intelligence. See United States v. Latchin, 554 F.3d 709, 710-11, 715 (7th Cir. 2009). Despite the fact that there was no evidence presented at trial showing that Latchin had taken any covert action, the district court sentenced him to 48 months' imprisonment on the Section 951 count, as well as the other counts of conviction for unlawfully

procuring citizenship, making false statements to the FBI and engaging in financial transactions with Iraq.

Thus, in each of these cases, defendants who were convicted of violating Section 951 for acts that did not constitute intelligence gathering or engaging in covert activity were sentenced to 48 months' imprisonment for their conduct, the same sentence that the government submits is appropriate here.

The defendant addresses at length the recent Butina case from the D.C. district court. (Def. Mem. at 12-13). In that case, Butina was not a trained intelligence officer and did not seek to gain access to classified information, but instead provided Russia with information about Americans who were in a position to influence U.S. politics and took steps to establish an unofficial (or backchannel) line of communication between Russia and these Americans. At sentencing, Butina conceded that she failed to notify the Attorney General of her conduct, but argued that she did not engage in espionage activity but instead just sought to create better relations between Russia and the United States. See generally United States v. Butina, No. 18-CR-218, ECF No. 120. In sentencing her, the district court found that Butina was not engaged in any espionage activity, but was seeking to collect information about individuals and organizations that could be helpful to the Russian government, at the direction of a Russian official. In imposing an 18-month sentence, the district court took into account that Butina had cooperated with the government, which led the government to make a U.S.S.G. § 5K1.1 motion on her behalf, and that Butina had agreed to an order of removal at the completion of her criminal sentence. See Butina, ECF No. 120 at 38.

The defendant here seeks to portray Butina's conduct as far more serious than her own, arguing that Butina's conduct posed a threat to our democratic institutions. But the sentencing submissions and sentencing transcript in that case makes clear that Butina, like Lin, tried to portray her criminal conduct as a simple failure-to-register and argued that she did not engage in espionage activity. In fact, as the Court recognized in sentencing her, the fact that Butina did not seek out classified information or that her conduct did not involve spy tradecraft did not diminish the harm that she caused to the United States. That is equally true for the defendant, because her conduct deprived the United States of the ability to know that PRC military officers working out of the PRC Mission had established essentially a backchannel method of sharing information with the PRC Government in ways that U.S. law enforcement was not easily able to track. But unlike Butina, the defendant did not cooperate with the government upon her arrest. Rather, following her arrest, the defendant engaged in further criminal conduct, seeking to obstruct the government's investigation of the Confederate by alerting the Confederate that the government was asking questions about him and encouraging him to leave the United States. The defendant did this, in part, because the Confederate was aware of her activities as a foreign agent and could have potentially been a witness against her.

In sum, a sentence of 48 months' imprisonment—which is within the range of sentences imposed for other Section 951 offenses—is warranted to impose just punishment and provide adequate deterrence and would avoid unwarranted sentencing disparities among similarly situated defendants.

19

V. Conclusion

 For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 48 months' imprisonment.

 Respectfully submitted,

 RICHARD P. DONOGHUE
 United States Attorney

 By: /s/ Douglas M. Pravda
 Douglas M. Pravda
 Alexander A. Solomon
 Ian C. Richardson
 Sarah M. Evans
 Assistant U.S. Attorneys
 (718) 254-7000

cc: Deborah A. Colson, Esq., counsel for the defendant (by ECF)
 USPO Jaime Turton (by email)