

Colson Law PLLC
80 Broad Street, 19th Floor
New York, NY 10004
(212) 257-6455
www.colsonlaw.com

November 19, 2019

By ECF

Honorable Ann M. Donnelly
United States District Court
225 Cadman Plaza East
Brooklyn, N.Y. 11201

    Re:    *United States v. Ying Lin,* 15 Cr. 601 (AMD)

Dear Judge Donnelly:

    I write in response to the government's sentencing letter submitted on November 15, 2019. Ms. Lin accepts responsibility for her crime, and she is prepared to receive just punishment. However, the sentence the government seeks is grossly disproportionate to her offense. The government mischaracterizes the nature of Ms. Lin's conduct and the seriousness of the security risk. For the reasons discussed in our opening brief and further clarified below, we respectfully ask the Court to impose a sentence of probation.

    1.  <u>Foreign Agent Activity</u>

    The government concedes that Ms. Lin accepted unaccompanied baggage in the context of her employment. Yet it simultaneously alleges her participation in a covert operation intended to threaten U.S. national security. According to the government, Ms. Lin "established a clandestine means of transmitting to the PRC materials obtained and valued by PRC military officers while concealing their source, nature and destination from the United States government." (Gov. Br. 10.) The government's hyperbolic language is highly misleading.

    First, Ms. Lin did not "establish" the practice. The shipment of unaccompanied baggage was initiated by an Air China general manager in 2002, shortly after Ms. Lin was hired as a counter agent. Various Air China employees participated from the outset. Indeed, the government's own discovery includes multiple baggage receipts initialed by five different counter agents. A fair number of the receipts pre-date Air China's formalization of the practice in December 2012.

Second, the practice was not "clandestine." Counter agents accepted the baggage in plain view at the Air China check-in counter at JFK Airport. They charged PRC officials $200 per bag. (PSR ¶ 9.) And they kept hard copies of the baggage receipts. (*Id.* at ¶ 10.)

Third, the record is devoid of evidence that PRC officials intended to "conceal" the source or nature of their shipments. The government cannot have it both ways, failing to disclose the contents of the baggage while simultaneously declaring that the shipments posed a security threat. All of the baggage passed through TSA security screening, and it was all subject to search by TSA officials. Had the PRC officials truly wished to conceal "valuable" "materials and information," Gov. Br. 14, they could have sent the baggage by diplomatic pouch. Diplomatic pouch shipments are exempt from the screening procedures required for cargo and checked baggage. *See* https://www.state.gov/diplomatic-pouches/ (diplomatic pouch defined). In other words, the PRC officials had another, lawful method of achieving precisely what the government claims they wanted. The government speculates that the officials had a nefarious intent without any basis in evidence.

Finally, Ms. Lin flatly rejects the government's assertion that her actions were motivated by her primary loyalty to the PRC. (Gov. Br. 12.) Ms. Lin is a proud American. She is also apolitical. She acted out of dedication to her employer, a sense of obedience, and a desire to perform her job well. The Air China employees who apparently labeled Ms. Lin a PRC loyalist had a clear motive to minimize their own conduct and shift blame. They also shipped unaccompanied baggage at the behest of their employer and received compensation from PRC officials. (*Id.* at 12, 15.)

None of the foreign agent cases discussed by the government are analogous. Unlike Alvarez, Ms. Lin did not gather information on prominent people or political developments at the direction of a foreign government. *Cf. United States v. Alvarez,* 506 F.Supp.2d 1285, 1288 (S.D. Fl. 2007) (defendant gathered information about anti-Castro individuals and groups for the Cuban government). Unlike Latchin, she did not act as a sleeper agent on behalf of a foreign intelligence service. *Cf. United States v. Latchin,* 554 F.3d 709, 715 (7th Cir. 2009) (former member of IIS acted on behalf of Iraq when he called the IIS agent who was second in command of the spy "sleeper program"). Unlike Dumeisi, she did not receive direction from foreign intelligence officers or procure press cards to facilitate the travel of foreign intelligence officers in the United States. *Cf. United States v. Dumeisi,* 424 F.3d 566, 581 (7th Cir. 2005) (defendant received payment and direction from the Iraqi Intelligence Service ("IIS"), supplied support to the IIS, and reported on Iraqi opposition activities). Unlike Buryakov, she did not

gather intelligence for or trade coded messages with foreign spies. *Cf. United States v. Buryakov,* 15-CR-073, Dkt. 10 (Ind.) (S.D.N.Y. Feb. 9, 2015) (alleging that defendant gathered intelligence for and traded coded messages with Russian spies). And unlike Butina, she did not "penetrat[e] deep" into American political organizations in order "to collect information about individuals and organizations that could be helpful to the Russian government." *Cf. United States v. Butina,* 18-CR-218, Dkt. 120 (Sent. Tr.), at 35:21-25, 35:15-17 (D.D.C. April 26, 2019).

Despite the government's suggestion to the contrary, Ms. Lin never engaged in clandestine activity. (Gov. Br. 17.) She was not a trained intelligence officer, and she was not employed by a foreign intelligence service. Ms. Lin acted within the scope of her employment for a major international corporation.

2. Obstruction of Justice

While the government offers a lengthy recitation of Ms. Lin's alleged obstruction, it overlooks certain key facts. First, Ms. Lin was one of several people who helped Mr. Qin to locate a lawyer, and she did so before sending the relevant text messages. Second, while Ms. Lin encouraged Mr. Qin to leave New York, she also told him that he might have to stay if "the prosecutor requests that you help with the investigation and detains you at the airport." (Gov. Br. 4-5.) Third, Mr. Qin returned to China with the permission of an SDNY prosecutor. *See* Gov. Mem. in Opp. to Disc. Motion, Dkt. 144, at 3 (Nov. 2, 2018). Fourth, several days later, an EDNY prosecutor told Mr. Qin's attorney that he was not a "target" of the EDNY investigation. *See* Bates YL034871 (provided to the Court upon request).

Even assuming the government's evidence of obstruction meets the preponderance standard, there is no basis for imposing an obstruction enhancement because the government fails to connect the obstructive conduct to the foreign agent offense. *See* U.S.S.G. § 3C1.1. The government asserts that Ms. Lin's "foreign agent activities extended to aiding the Confederate [Mr. Qin], who was himself under investigation for acting as an agent of the PRC." (Gov. Br. 13.) This theory has zero foundation in the facts. Mr. Qin hired Ms. Lin to assist with the renovation of his private residence on Long Island. (S-2 Ind. ¶ 32.) The renovation contract was negotiated between private parties (Mr. Qin and U.S. Rilin Corporation) for the benefit of a private individual (Mr. Qin). *See United States v. Dan Zhong,* 16-CR-614, Dkt. 1, at ¶ 24 (Nov. 9, 2016) (U.S. affiliate of Rilin charged Mr. Qin $1.28 million for the project). The PRC government was not involved and did not stand to benefit. Accordingly, Ms. Lin's coordination of the project had nothing to do with the foreign agent offense.

Nor has the government proffered evidence of Mr. Qin's supposed foreign agent activities. It does not allege that he assisted Air China to ship unaccompanied baggage or that he took other actions at the direction of PRC officials. Although the government now states it was investigating Mr. Qin's foreign agent conduct, the government told Mr. Qin's attorney in 2015 that he was *not* a grand jury target. Absent some factual connection between Mr. Qin and the PRC government, there is no basis to conclude that he acted as a foreign agent.

Moreover, since the government fails to establish that Mr. Qin had any involvement in the unaccompanied baggage conspiracy or even knew about it, he could not have testified against Ms. Lin at a foreign agent trial. Accordingly, she had no personal motivation to make him unavailable.

Finally, the government mischaracterizes the meaning of the "loopholes" text message. In September 2015, prosecutors advised Ms. Lin that she was under investigation for obstruction of an unrelated Southern District matter. She met with them to explain her conduct, and the obstruction investigation was dropped. Ms. Lin sent the "loopholes" message on the heels of that proffer. Her comment did not concern the unaccompanied baggage allegations; in fact, she was not charged with smuggling until ten months later. Instead, Ms. Lin feared that prosecutors would "interview [her] again" because of her "contact" with Mr. Qin, *see* Gov. Br. 6, and she wanted to avoid a second, baseless obstruction investigation.

In short, the government fails to establish any link between Ms. Lin's alleged obstructive conduct and the instant offense. Accordingly, an obstruction enhancement does not apply.

3. Structuring

The government also fails to provide any basis for the Court's consideration of Ms. Lin's alleged structuring. Ms. Lin did not plead guilty to structuring and was not convicted after trial. Further, the government mischaracterizes critical facts.

First, the government improperly suggests that Ms. Lin structured cash assets in order to conceal "the source of her compensation for acting as an agent of the PRC government." (Gov. Br. 3.) Prosecutors have never provided proof of this. The S-2 indictment does not allege that Ms. Lin received cash in exchange for her foreign agent activity; it states that she was compensated with discount liquor and electronics. (S-2 Ind. ¶ 23.) During its investigation, the government reviewed many thousands of Ms. Lin's personal documents, text messages, and email communications. It did not uncover any proof that PRC officials paid her in cash. This theory is also belied by the government's

own sentencing letter. On page twelve, the government asserts that PRC officials "tip[ped]" Ms. Lin and her Air China colleagues but did not provide them with "equal payment for [their] services." (Gov. Br. 12.) Again the government cannot have it both ways, suggesting that Ms. Lin received significant monetary compensation from PRC officials, prompting her structuring, while simultaneously characterizing the payments as mere tips.

Second, in an effort to obscure, the government offers various irrelevant facts. According to the government, Ms. Lin exchanged cash for checks with co-workers and sold them iPhones purchased from the duty free store. The former claim begs the question whether the cash was a proceed of the foreign agent activity which, again, the government has no basis to assert. Further, Ms. Lin bought the iPhones at her colleagues' request and re-sold them at cost; she did not earn any profits to conceal.

Third, as the government is aware, the $50,000 seized from Ms. Lin upon her arrest was owed to Mr. Qin's landscaper. When Ms. Lin explained this to the agents, they returned the money to her. Moreover, the $200,000 seized from Ms. Lin's family was taken from a safe deposit box jointly owned by Ms. Lin and her mother. Ms. Lin told the government that the money belonged to her mother, and it was returned following her guilty plea.

  4. <u>The Appropriate Sentence</u>

A four-year sentence would be grossly excessive. Ms. Lin is a first-time offender with a perfect record of compliance on pretrial release. She is committed to rehabilitation and has sought to make amends. She has also suffered significant punishment, including the loss of her job and reputation and the payment of more than $170,000 to the government to avoid forfeiture of her personal home. Ms. Lin does not present a danger to the community, and her risk of recidivism is exceedingly low. A probationary sentence would be sufficient but not greater than necessary to achieve the goals of sentencing.

Respectfully,

/s/

Deborah Colson
*Attorney for Ying Lin*

cc: AUSA Ian Richardson
   AUSA Doug Pravda
   AUSA Alex Solomon